AO 106 (Rev. 04/10) Application for a Search Warrant



FILED

AUG 1 4 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. 3:19SW248
)
10484 Cherry Street, King George, Virginia )
("TARGET LOCATION 8") )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
10484 Cherry Street, King George, Virginia ("TARGET LOCATION 8")

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846; 21 USC 841; 18 USC 1956(h); 18 USC 922(g); 18 USC 924(c) | Conspiracy to Distribute Controlled Substances; Possession with Intent to Distribute and Distribution of Controlled Substances; Money Laundering Conspiracy; Felon in Possession of a Firearm, Possession of a Firearm in Furtherance of a Drug Trafficking Offense |

The application is based on these facts:
See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Cameron Taylor/DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/14/2017

_____
*Judge's signature*

City and state: Richmond, Virginia

Roderick C. Young, Magistrate Judge US District Court
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **10484 Cherry Street, King George, Virginia** ("**TARGET LOCATION 8**") | **Case No.** |
| **A white 2008 Ford Crown Victoria VIN: 2FAFP71V38X178822 Maryland tag 5CV6135** ("**TARGET VEHICLE 1**") | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

    I, Cameron Taylor, a Special Agent for the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

    1.    I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). This affidavit is made in support of a search warrant for the following location:

    a.  10484 Cherry Street, Apartment 110C, King George, Virginia ("**TARGET LOCATION 8**")[1]

    b.  A white 2008 Ford Crown Victoria, VIN: 2FAFP71V38X178822, Maryland tag 5CV6135 ("**TARGET VEHICLE 1**")

    As part of this investigation, your affiant's co-case agent is contemporaneously submitting a separate application to the magistrate court in the District of Maryland for authorization to search the following locations: 6116 Teaberry Way, Clinton, Maryland ("**TARGET LOCATION 1**");

---

[1] For clarity, the target facilities are capitalized and bold (**TARGET LOCATION 1**), and target individuals and intercepted telephones are lower case and bold (**Anthony Dotson** and **Target Telephone 1**).

4L JP Morgan Court, Waldorf, Maryland, 24/7 Everyday Automotive & Detailing ("Everyday Automotive") ("**TARGET LOCATION 2**"); 3325 Leonardtown Road, Unit 683 Waldorf, Maryland, Economy Storage of Waldorf ("**TARGET LOCATION 3**"); 6337 South Lake Court, Bryans Road, Maryland ("**TARGET LOCATION 4**"); 9635 Daffodil Place, Waldorf, Maryland ("**TARGET LOCATION 5**"); 2000 Amber Leaf Place, Apartment 17, Waldorf, Maryland ("**TARGET LOCATION 6**"); and 4825 Towne Park Road, Suitland, Maryland ("**TARGET LOCATION 7**"). This affidavit does not seek authorization to search **TARGET LOCATION 1** through **TARGET LOCATION 7**, but contains some information concerning a number of those locations in order to provide context for the rest of the investigation.

2.      Based on the facts alleged in this affidavit, there is probable cause to believe that the following individuals and others have violated and are violating 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. § 841 (possession with intent to distribute and distribution of controlled substances), 18 U.S.C. § 1956(h) (money laundering conspiracy), 18 U.S.C. § 922(g) (felon in possession of a firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking offense) ("Target Offenses"):

a.      **Anthony Kenneth Dotson Jr.**, a/k/a "Streetz," "Ghost," and "Rico" ("**Dotson**").

b.      **Marvin Windell Gray**, a/k/a "Marv," ("**Gray**").

c.      **James Anthony Harvey Jr.**, a/k/a "Fat Bread" and "Patches" ("**Harvey**").

d.      **Marcellus Jerome Woodland**, a/k/a "Cellus" ("**Woodland**").

e.      **Ronald Shelton Dickerson**, a/k/a "Ronnie D" ("**Dickerson**").

f.      **Joseph Daniel Karis**, a/k/a "DK" and "Danny" ("**Karis**").

2

      g.    **Tiara Mackall**, a/k/a "Tee" ("Mackall").[2]

3.    There is also probable cause to believe that evidence of the Target Offenses (described in Attachment B) will be found in the Target Locations (described in Attachments A-1 and A-2).[3]

## AGENT TRAINING AND EXPERIENCE

4.    I am a federal agent with DEA and have been employed in such capacity since 2001 in both domestic and international offices. As a federal narcotics agent, my primary duty is to investigate alleged violations of the Controlled Substances Act as well as associated federal and state criminal statutes.

5.    During my 18 years with DEA I have interviewed numerous individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my extensive training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers of controlled dangerous substances.

6.    I have participated in a number of Organized Crime Drug Enforcement Task Force ("OCDETF") investigations concerning drug trafficking organizations and violent street gangs involved in the distribution of various controlled substances, including heroin, fentanyl, cocaine

---

[2] This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of your affiant's knowledge about this investigation.

[3] This application does not seek authorization to search **TARGET LOCATIONS 1** through **TARGET LOCATION 7**, which are located in the District of Maryland. Your affiant's co-case agent is contemporaneously submitting a separate application to the magistrate judge in the District of Maryland for authorization to search **TARGET LOCATION 1** through **TARGET LOCATION 7**.

hydrochloride and cocaine base or "crack" cocaine, phencyclidine ("PCP"), MDMA ("ecstasy"),

marijuana and weapons to include handguns and rifles. As a result, I have experience debriefing

criminal defendants, witnesses, and other persons with direct experience in the methods used to

distribute controlled substances. I have actively taken part in the purchase of various controlled

substances and weapons, either by using confidential sources, undercover agents, or acting in an

undercover capacity. I have participated in the surveillance of drug and weapon traffickers and

observed "hand to hand" drug transactions. Through these investigations, I have direct knowledge

of the concealment methods utilized by drug and weapons traffickers, to include the use of "stash"

houses and locations utilized by drug traffickers to conceal their contraband.

7.     As a participant in prior Title III investigations, I have become familiar with the

use of cell phones by narcotics traffickers to communicate, the patterns of activity of narcotics

traffickers, the types and amounts of profits typically made by narcotics traffickers, and the

methods, language, and terms used to disguise the source and nature of the profits obtained from

narcotics trafficking. In addition, from my training and experience, I have learned that it is common

for narcotics traffickers: (1) to "front" (or provide on consignment) controlled substances to their

customers, (2) to conceal contraband, proceeds of narcotics sales, and records of narcotics

transactions in secure locations within their residences, vehicles and/or their businesses for ready

access, (3) to conceal proceeds from law enforcement authorities and rival narcotics traffickers,

and (4) to routinely use digital display cell phones and text messaging to facilitate their drug

distribution operations. I have also learned that narcotics-trafficking is an ongoing process,

requiring the development, use, and protection of a communication network to facilitate daily

narcotics distribution, and as such, narcotics traffickers commonly use coded language when

4

speaking with other narcotics traffickers, use multiple cell phones, and frequently change their cell phone numbers in order to thwart detection by law enforcement agents who may be intercepting or attempting to intercept their communications.

8.      Based on my training, experience, knowledge, and participation in narcotics and firearms investigations, and the training and experience of other agents and detectives with whom I am working closely in this investigation, I also know that:

a.      Those who distribute and conspire to distribute controlled substances ("drug traffickers") maintain records electronically and in hardcopy—including ledger books, records, receipts, notes, bank and credit card records, money orders, cashier's checks, bus and plane tickets, records indicating the existence of a storage facility, and other records—relating to the importation, manufacture, transport, ordering, sale, and distribution of controlled substances. Those records are commonly maintained in secure locations to which drug traffickers have ready access, such as locations within (i) their residences (including curtilage), (ii) the residences of trusted associates (including family members, friends, and coconspirators), (iii) the places of operation of their drug distribution activities (such as "stash houses" or "safe houses"), (iv) business locations with which the trafficker or their close associates are affiliated, (v) their vehicles, and (vi) other similarly secure storage areas ("secured locations"). Drug traffickers often maintain such evidence for long periods of time.

b.      Drug traffickers routinely conceal in secured locations the proceeds of their drug transactions, including large quantities of currency, financial instruments, precious metals, jewelry, and other items of value tied to or purchased with such proceeds. Drug traffickers often launder their drug proceeds to disguise the nature and source of those proceeds and to promote their drug trafficking activities.

c.      Drug traffickers often maintain contraband and instrumentalities related to the activity at secured locations, such as cell phones, firearms and other weapons, ammunition, scales, razors, packaging materials, cutting agents, cooking utensils, blenders, filtration masks, and containers for preparing and storing controlled substances for distribution. Drug traffickers often maintain multiple cell phones, firearms, and other instrumentalities of drug trafficking in secured locations.

d.      Drug traffickers commonly maintain at secured locations contact information and address books electronically and in hardcopy that reflect names, addresses, and telephone numbers for associates in their illegal organization. As described below,

such individuals often utilize cellular telephones, computers, and telephone systems to maintain contact with their associates in their illegal businesses.

e. Drug traffickers often take photographs of themselves, their associates, their property, and illegal contraband. Such photographs are usually maintained in one or more secured locations, including on cell phones or computers found within such locations.

f. Drug traffickers often use their vehicles to meet with suppliers and coconspirators, sell to drug buyers, travel to stash houses, transport drugs and drug proceeds, conduct counter-surveillance, and maintain instrumentalities of drug trafficking (including firearms, ammunition, and digital scales). The location information associated with a drug trafficker's vehicle assists law enforcement with identifying the drug trafficker's residence, identity, buyers, coconspirators, suppliers, stash houses, meeting locations, and the financial institutions where the drug trafficker launders proceeds.

g. Sophisticated drug traffickers often use the internet to purchase illicit narcotics from international and domestic sellers. Those individuals use computers, cellular telephones, and other electronic devices to search for, purchase, and track the shipping status of illicit narcotics (including MDMA) via the internet. Those individuals also use virtual currency such as Bitcoins to pay for the illicit narcotics. Evidence of those transactions are found in several places including virtual wallets, Bitcoin exchanges, Bitcoin wallets, emails, text messages, and other online records. Individuals involved in illicit narcotics transactions over the internet often use internet enabled devices to communicate with other members to facilitate their conspiracy to buy, sell, and distribute narcotics.

9. I also know that drug traffickers use cell phones in furtherance of drug trafficking, and that the location data associated with those cell phones normally constitutes evidence and leads to evidence of drug trafficking. In particular, I know that:

h. Narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. Narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine ("PCP"), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I have become familiar the

6

methods, language, and terms that narcotics traffickers use to disguise conversations about their narcotics activities.

i.    Drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to impede law enforcement efforts. Drug traffickers also communicate by use of text messaging to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Drug dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate daily narcotics distribution.

j.    To that end, drug traffickers use communication facilities (including cell phones) to further every aspect of the drug trade. Drug traffickers use communication facilities to contact—by way of both voice call and electronic message—drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs. Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, and the instruments of the drug trade (including firearms). Further, the location data associated with a drug trafficker's cell phones assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

**THE TARGETS**

10.    **Dotson**, a male with the year of birth 1989 and FBI number ending in 6JC6, is a fentanyl and heroin distributor. As discussed in this affidavit, Confidential Source 1 ("CS1") and Confidential Source 2 ("CS2") made controlled purchases of heroin and fentanyl from **Dotson**. Moreover, a Title III investigation on cell phones **Dotson** and his associates utilized confirmed that **Dotson** is the leader of a significant fentanyl and heroin trafficking organization that primarily operates in Charles County. **Dotson** has the following criminal history:

| Date | Charge | Location | Disposition |
|---|---|---|---|
| 4/5/2011 | Controlled Dangerous Substance ("CDS") Possession Not Marijuana | Charles County, Maryland | One year and six months' imprisonment (suspended) |
| 11/16/2011 | Violation of Probation | Charles County, Maryland | One year and six months' imprisonment |
| 5/4/2018 | Assault 2nd Degree | St. Mary's County, Maryland | Four years' imprisonment, three years and three months suspended, three years' supervised probation |

11.    **Gray**, a male with the year of birth 1975 and FBI number ending in 5TA3, is one of **Dotson**'s coconspirators and a lieutenant in the **Dotson** drug trafficking organization. **Gray** assists **Dotson** with his drug trafficking activities. **Gray** has the following criminal history:

| Date | Charge | Location | Disposition |
|---|---|---|---|
| 3/14/1994 | CDS Possession of Marijuana | Charles County, Maryland | Fine $200 (suspended) |
| 8/2/1994 | Violation of Probation (Theft) | Charles County, Maryland | One year and four months' imprisonment |
| 12/19/2008 | Burglary Fourth Degree Theft (Two Counts) | Charles County, Maryland | 27 months' imprisonment (suspended) |
| 5/7/2016 | Failure to Obey Lawful Order Resisting or Interfering with Arrest | Charles County, Maryland | 60 days' incarceration, 56 days suspended |

12.    **Harvey**, a male with the year of birth 1972 and FBI number ending in 7NA0, is one of **Dotson**'s drug distributors and a nominee for a stash location **Dotson** utilized. **Harvey** has the following criminal history:

8

| Date | Charge | Location | Disposition |
|---|---|---|---|
| 9/28/1992 | Possession with Intent to Distribute<br><br>CDS Distribution with Firearm<br><br>Possession of Drug Paraphernalia | Charles County, Maryland | One year incarceration |
| 7/8/1994 | Concealing Deadly Weapon | Charles County, Maryland | 152 days' imprisonment, suspended five months two days |
| 6/25/1997 | Felon in Possession of Firearm | United States District Court, District of Maryland | 36 months' imprisonment, three years' supervised release |
| 3/8/2004 | Assault-First Degree (Two Counts) | Charles County, Maryland | 8 years' imprisonment, (one year and six months suspended), three years' supervised probation |

## CONFIDENTIAL SOURCES

13.     During this investigation, law enforcement received information concerning the drug trafficking activities of **Dotson**, **Gray**, and others from confidential sources. The credibility and the reliability of those sources is addressed below.[4]

### *Confidential Source 1*

14.     CS1—whose criminal history includes two convictions for misdemeanor theft that were adjudicated in 2009—is an established source for the Charles County Sheriff's Office ("CCSO"). In May 2018, CS1 began working with the CCSO for monetary compensation. CS1

---

[4] Confidential sources and other civilian witnesses are referred to using male pronouns, regardless of gender.

previously conducted proactive operations on behalf of the CCSO and the DEA that resulted in the seizure of narcotics and drug-related evidence.

15.    To your affiant's knowledge, CS1 has not provided false or misleading information to officers investigating drug trafficking in Charles County. Additionally, CS1 provided investigators with information that law enforcement corroborated to the extent possible through independent sources, surveillance, and telephone analysis. Based on the information that CS1 provided to investigators, as well as law enforcement's interactions with CS1, your affiant finds CS1 to be credible and reliable.

### *Confidential Source 2*

16.    CS2—a paid CCSO informant whose criminal history includes convictions for possession of CDS, possession of CDS paraphernalia, and misdemeanor theft—is an established source for the CCSO. CS2 previously conducted proactive operations on behalf of the CCSO and the DEA that resulted in the seizure of narcotics and drug-related evidence. CS2 began providing information to law enforcement relevant to this investigation in April 2019.

17.    To your affiant's knowledge, CS2 has not provided false or misleading information to the CCSO or the DEA. Additionally, CS2 provided information to investigators that law enforcement corroborated to the extent possible through independent sources, surveillance, and telephone analysis. Based on the information CS2 provided to law enforcement, your affiant finds CS2 to be credible and reliable.

### PROBABLE CAUSE

18.    Beginning around February 2017, the DEA, the Prince George's County Police Department ("PGPD"), and the CCSO began an investigation into the heroin and fentanyl

trafficking activities of **Dotson**, who was operating primarily in Prince George's County and Charles County. During the investigation, your affiant learned that **Dotson** maintains a supervisory role in a drug trafficking organization that utilizes multiple cell phones (or "burner phones") to conduct its drug trafficking activities. Additionally, your affiant learned that **Dotson** employs "runners" that sell fentanyl and heroin on **Dotson**'s behalf.

19.     Specifically, CS1 informed law enforcement that **Dotson** normally provided CS1 with a phone number to contact **Dotson** so that CS1 could purchase heroin, and that **DOTSON** at times sent runners to sell heroin on **Dotson**'s behalf. CS1 subsequently identified **Gray** and **Harvey** as members of the **Dotson** drug trafficking organization. CS1 thereafter conducted controlled purchases of fentanyl and heroin from **Dotson** and other members of the drug trafficking organization.[5]

20.     CS2 provided information concerning **Dotson**'s drug trafficking activities and said that he had been purchasing five-gram quantities of heroin from **Dotson** since approximately November 2018. CS2 identified several of **Dotson**'s coconspirators, said that **Dotson** wanted CS2 to increase the quantity of heroin CS2 was purchasing from **Dotson**, and said that CS2 observed **Dotson** with a quantity of heroin that was "broken down" into one-gram, five-gram, and 10-gram

---

[5] All of the controlled purchases described in this affidavit were conducted under the direction of law enforcement officers. In every instance, law enforcement searched the confidential sources for contraband prior to and immediately after the transactions. The law enforcement provided the confidential sources with official authorized funds to conduct the transactions, and kept the confidential sources under constant surveillance during the transactions. Moreover, the confidential sources were equipped with recording devices to record the transactions. After the controlled purchases, officers debriefed the confidential sources.

quantities for sale. Law enforcement utilized CS2 to conduct controlled purchases of fentanyl and heroin from **Dotson**, as more fully described below.

21.     As a result of the investigation, the Honorable United States District Judge Paul W. Grimm signed an order authorizing the interception of wire and electronic communications occurring over **Dotson's** cell phones—**Target Telephone 1** and **Target Telephone 2**.

22.     The interceptions verified that **Dotson, Gray, Harvey**, and others, are engaged in a large fentanyl and heroin trafficking organization in the Southern Maryland region. Moreover, interceptions revealed that **Dotson** is utilizing multiple sources of supply for fentanyl, heroin, and cocaine.

*23.*     Your affiant and other officers learned through extensive surveillance that **TARGET LOCATION 1** is **Dotson's** primary residence, and that **Dotson** lives at this location with his paramour, Individual 1. Law enforcement has observed **Dotson**, Individual 1, and a small male child at **TARGET LOCATION 1** on numerous occasions. Further, on April 8, 2019, **Dotson** provided **TARGET LOCATION 1** as his address of record to CCSO officers who were investigating a domestic disturbance in Waldorf, Maryland.

24.     **Dotson** maintains a business identified as Everyday Automotive located in Waldorf, Maryland in an end unit in a row of businesses that is situated in an industrial park. Your affiant and other officers have conducted extensive surveillance at this location and have a covert camera installed in an adjacent parking lot to assist in covertly viewing **TARGET LOCATION 2**. Your affiant and other officers have observed **Dotson, Gray**, and **Harvey**, as well as vehicles those subjects operate, on almost a daily basis coming and going from **TARGET LOCATION 2**. Officers have also observed **Dotson** on numerous occasions unlock the front door to **TARGET**

12

**LOCATION 2** using a key. Further, on April 12, 2019, an individual called the CCSO and complained that the employees of Everyday Automotive are selling drugs.

25.    Economy Storage of Waldorf owns and operates **TARGET LOCATION 3**. Your affiant knows—based on business records obtained from Economy Storage, intercepted calls, and surveillance—that **Dotson** had **Harvey** (one of **Dotson**'s runners) rent storage Unit 683 (**TARGET LOCATION 3**) in **Harvey's** name. Based on surveillance, your affiant knows that **Dotson** previously had a storage unit at a facility located on Industrial Park Drive, Waldorf, Maryland. Based on intercepted calls and surveillance, your affiant believes that **Dotson** utilizes **TARGET LOCATION 3** as a stash and drug preparation location.

### Target Location 8 and Target Vehicle 1

26.    **TARGET LOCATION 8** is **Harvey**'s primary residence. As stated previously, CS1 identified **Harvey** as one of **Dotson**'s drug runners. Your affiant knows based on MVA records that **Harvey** lists his address of record as 5310 Holly Street, Indian Head, Maryland. Moreover, the vehicle that **Harvey** routinely uses to distribute drugs on **Dotson**'s behalf—a white 2008 Ford Crown Victoria with Maryland tag 5CV6135 bearing Vehicle Identification Number (VIN) 2FAFP71V38X178822 ("**TARGET VEHICLE 1**")—is listed to Cheri Harvey (**Harvey**'s paramour) at the same address.

27.    On July 18, 2019, officers served a subpoena on the Glennel Apartments, located on Cherry Street in King George, Virginia. The resident agent for Glennel Apartments informed those officers that **James Harvey** and Cherri Harvey were the only tenants residing in **TARGET LOCATION 8**. Further, on April 13, 2019, the King George County Sheriff's Office arrested **Harvey** for driving while intoxicated. During the booking process, **Harvey** provided his cellular

13

number as 240-377-6157—the same number intercepted on **Target Telephones 1 and 2**. Based on the following evidence, your affiant believes that **Harvey** resides at **TARGET LOCATION 8**.

28. In May 2018, CCSO detectives debriefed CS1. CS1 identified **Dotson** and stated that **Dotson** was selling heroin in Charles County. CS1 further stated that **Dotson** normally provided CS1 with a phone number to contact him in order to purchase heroin, and sometimes sent out "runners" to sell heroin on **Dotson**'s behalf. CS1 subsequently identified **Gray** and **Harvey** as members of the **Dotson** drug trafficking organization.

29. On May 5, 2018, **Dotson** was arrested for assault and destruction of property in St. Mary's County. **Dotson** subsequently pled guilty to second degree assault and was sentenced to four years' imprisonment with three years and three months suspended. On June 28, 2018, **Dotson** was committed to the St. Mary's County Detention Center to serve his sentence.

30. On August 15, 2018, CCSO detectives met with CS1 for the purpose of conducting a controlled purchase of heroin. CS1 made a consensually monitored and recorded cellular phone call to 301-399-4454 and arranged to purchase a $100 quantity of heroin. During the call, CS1 was instructed to meet at the CVS Pharmacy parking lot located on Leonardtown Road in Waldorf, Maryland. CS1 travelled to the CVS Pharmacy where CS1 met with **Harvey** in the parking lot and conducted the transaction with **Harvey**, exchanging $100 in law enforcement funds for a quantity of heroin. **Harvey** was operating **TARGET VEHICLE 1** during the transaction.

31. After the transaction, CS1 provided the detectives with the suspected heroin that CS1 purchased from **Harvey**. The suspected heroin and packaging were consistent with fentanyl/heroin. The suspected heroin was not subjected to a "field test."

32.     On June 12, 2019 at approximately 8:35 p.m., **Target Telephone 1** placed a voice call (Call 700) to 240-377-6157, a phone utilized by **Harvey**. The following is a draft transcript of the call between **Dotson** and **Harvey**.

| | |
|---|---|
| **Harvey:** | Hello? |
| **Dotson:** | You leave yet? |
| **Harvey:** | No. |
| **Dotson:** | Alright. |
| **Harvey:** | Alright. |
| **Dotson:** | I should've just went down there and meet him, yo. |
| **Harvey:** | I can head down there. |
| **Dotson:** | He at the Deluxe Inn. It's $200, it ain't like it's 50, you feel me? |
| **Harvey:** | Right. Alright, I'll shoot down there real quick. I'm on my way there. |
| **Dotson:** | Bet. |

33.     Your affiant believes that in this conversation, **Dotson** directed **Harvey** to distribute the $200 quantity of fentanyl to **Individual 2** at the Deluxe Inn. Based on this call, surveillance officers were alerted to the pending meeting between **Harvey** and **Individual 2**.

34.     At approximately 8:45 p.m., officers established surveillance at the Deluxe Inn in La Plata, Maryland. Officers observed a white male—later identified as **Individual 2**—standing outside the hotel smoking a cigarette. At approximately 9:08 p.m., officers observed **Harvey** operating the **TARGET VEHICLE 1** arrive in the parking lot. **Individual 2** got into the passenger side of **Harvey**'s vehicle. **Harvey** then drove through the parking lot with **Individual 2**, and **Individual 2** exited the vehicle a few moments later and returned to the hotel. Your affiant believes

15

that **Harvey** met with **Individual 2** for the purpose of distributing the $200 quantity of fentanyl to

**Individual 2**.

35.     On June 19, 2019, beginning at approximately 4:10 p.m., **Target Telephone 1**

exchanged the following text messages with 301-848-3965, a number utilized by a drug customer

of **Dotson**'s identified here as Individual 10:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 4:10 p.m. | 4397 | Incoming | You around |
| 4:53 p.m. | 4411 | Outgoing | Go to the McDonald's on route 5 |
| 4:54 p.m. | 4414 | Incoming | K |
| 5:09 p.m. | 4420 | Incoming | Here |
| 5:19 p.m. | 4424 | Outgoing | How much |
| 5:19 p.m. | 4426 | Incoming | Small |

36.     Your affiant believes that when **Dotson** texted Individual 10 "how much" and

Individual 10 replied "small," Individual 10 was using coded language to request a half-gram

quantity of fentanyl. After intercepting this conversation, surveillance units were alerted to the

pending drug transaction.

37.     At approximately 5:05 p.m., surveillance officers observed Individual 10 arrive

at the McDonald's restaurant located on Leonardtown Road, Waldorf, Maryland, operating a white

Volkswagen sports utility vehicle with Maryland tag 6DF5652 ("the Volkswagen SUV").

Individual 10 parked in a parking space at the McDonald's. At approximately 5:28 p.m., officers

observed **Harvey** (operating **TARGET VEHICLE 1**) drive slowly through the McDonald's

parking lot. **Harvey** exited the parking lot onto Leonardtown Road, and Individual 10 pulled out

of the parking lot behind **Harvey**. Individual 10 followed **Harvey** to the AutoZone located on

Leonardtown Road, and both **Harvey** and Individual 10 pulled into the AutoZone parking lot,

where Individual 10 parked next to **Harvey**'s vehicle (**TARGET VEHICLE 1**). As an officer

16

drove past **Harvey** and Individual 10's vehicles, the officer observed **Harvey** standing outside of

**TARGET VEHICLE 1** and Individual 10 getting back into the Volkswagen SUV. Based on the

text messages with **Dotson** and surveillance of **Harvey** and Individual 10, your affiant believes

that **Harvey** met with Individual 10 to conduct a drug transaction.

38.     On July 8, 2019 at approximately 3:46 p.m., **Target Telephone 1** placed an

outgoing call (Call 14435) to 240-377-6157, a phone utilized by **Harvey**. The following is a partial

draft transcript of the conversation between **Dotson** and **Harvey**.

| | |
|---|---|
| **Dotson**: | Go see, I told what's her name go to Boston Market, Marilyn, you know she gets two, uh, two of the bags, alright? |
| **Harvey**: | Alright. |
| **Dotson**: | But don't touch none of that shit, just give her what I say give her bro, honestly. |
| **Harvey**: | Alright. |
| **Dotson**: | She gonna have a hundred alright? |
| **Harvey**: | Alright. |
| **Dotson**: | So you already kept a hundred and a thirty, alright, now I got to start re-up pretty much, so a hundred dollars. |
| **Harvey**: | Alright. |
| **Dotson**: | Later, Boston Market, alright. |

39.     Your affiant believes that when **Dotson** told **Harvey** "Go see, I told what's her

name go to Boston Market, Marilyn, you know she gets two, uh, two of the bags," **Dotson** was

directing **Harvey** to sell fentanyl/heroin ("two of the bags") to Individual 5 ("Marilyn"), a drug

customer of **Dotson**'s. When **Dotson** told **Harvey** "you already kept a hundred and a thirty,"

17

**Dotson** was using vague language to tell **Harvey** that $130 ("a hundred and a thirty") was **Harvey**'s payment for selling to **Dotson**'s customers on **Dotson**'s behalf. Based on this call, surveillance agents were alerted to the pending meeting between **Harvey** and Individual 5.

40.     At approximately 3:54 p.m., a surveillance officer observed Individual 5 sitting in her blue Nissan in the parking lot of the Boston Market, located on Crain Highway, Waldorf Maryland. At approximately 3:57 p.m., the officer observed **Harvey** arrive in the parking lot operating **TARGET VEHICLE 1**. **Harvey** parked next to Individual 5 and Individual 5 got out of the Nissan and into the passenger seat of **TARGET VEHICLE 1**, leaving **Harvey**'s passenger door open. Individual 5 immediately got out of **TARGET VEHICLE 1** and got back into her car. Both **Harvey** and Individual 5 then left the parking lot. Based on the call and surveillance, your affiant believes that **Harvey** distributed fentanyl/heroin to Individual 5 on **Dotson**'s behalf.

41.     On July 8, 2019 at approximately 7:39 p.m., **Target Telephone 1** placed an outgoing call (Call 14531) to 240-377-6157, a phone utilized by **Harvey**. The following is a draft transcript of the conversation between **Dotson** and **Harvey**.

| | |
|---|---|
| **Harvey:** | Hello? |
| **Dotson:** | Go to Olive Garden that way you can hit Jamie and him up, one got fifty and one got forty, alright? |
| **Harvey:** | So just go to Olive Garden? |
| **Dotson:** | Yeah, that way you can do one stop shopping. |
| **Harvey:** | Alright. |

42.     Your affiant believes that when **Dotson** told **Harvey** "go to Olive Garden that way you can hit Jamie and him up, one got fifty and one got forty," **Dotson** was using coded language

to direct **Harvey** to distribute fentanyl/heroin to two more of **Dotson**'s customers. Based on this call, surveillance was alerted.

43. Surveillance officers responded to the Olive Garden restaurant located at 3620 Crain Highway, Waldorf, Maryland. At approximately 7:41 p.m., officers observed **Harvey** (operating **TARGET VEHICLE 1**) pull into the parking lot and park behind the restaurant. At approximately 7:43 p.m., officers observed Individual 11, a frequent drug customer of **Dotson**'s, pull into the parking lot operating a silver Chrysler 300 sedan and park behind the restaurant. Individual 11 exited his vehicle and briefly got into **TARGET VEHICLE 1**. Individual 11 then got out of **Harvey**'s vehicle and got back into the Chrysler 300, then left the parking lot. At approximately 7:49 p.m., a white male wearing an Olive Garden uniform walked quickly from the side of the restaurant to **TARGET VEHICLE 1** and got into the passenger side. The white male then exited **Harvey**'s vehicle and walked back to the Olive Garden. **Harvey** subsequently departed the Olive Garden parking lot. Based on the intercepted call and surveillance, your affiant believes that **Harvey** met with Individual 11 and the white Olive Garden employee ("Jamie") for a drug transaction.

44. During the investigation, **Harvey** has distributed to a number of **Dotson**'s drug customers on **Dotson**'s behalf. During the conversation described below on July 31, 2019, **Dotson** and **Gray** discuss **Harvey**'s role in the organization (using **Harvey**'s moniker, "Fat Bread").

45. On July 11, 2019, surveillance officers observed **Harvey** in **TARGET VEHICLE 1** departing from **TARGET LOCATION 2**. Officers maintained surveillance of **Harvey** as he travelled south on Maryland Route 301, across the Harry Nice Bridge, and into Virginia. Officers maintained surveillance of **Harvey** until he arrived at **TARGET LOCATION 8**.

19

46.     On July 12, 2019 at approximately 9:20 a.m., a surveillance officer observed **Harvey** in the parking lot of **TARGET LOCATION 8** changing a tire on **TARGET VEHICLE 1**. On July 14, 2019, officers conducted a spot check of **TARGET LOCATION 8** and observed **TARGET VEHICLE 1** in the parking lot.

47.     On July 20, 2019, beginning at approximately 7:20 a.m., **Target Telephone 2** exchanged the following text messages with 240-377-6157, a phone utilized by **Harvey**.

| *Time* | *Call Number* | *Direction* | *Text Message* |
|--------|---------------|-------------|----------------|
| 7:20 a.m. | 1123 | Incoming | Hit me when u get up |
| 8:57 a.m. | 1124 | Outgoing | What's goood |
| 8:58 a.m. | 1125 | Incoming | Seeing what time u leaving |
| 8:59 a.m. | 1126 | Outgoing | Soon |
| 9:00 a.m. | 1127 | Incoming | Ok I put the stuff and what was in camper in storage |
| 9:01 a.m. | 1128 | Outgoing | Ok bet wya |
| 9:02 a.m. | 1129 | Incoming | Headed across bridge |
| 9:03 a.m. | 1130 | Outgoing | Which way toward me or to go home |
| 9:05 a.m. | 1131 | Incoming | Home meet u on this side somewhere when u get on this side |
| 9:11 a.m. | 1132 | Outgoing | U get the strap |
| 9:13 a.m. | 1133 | Incoming | In storage in the box of trash bags |
| 9:16 a.m. | 1134 | Outgoing | Ok |

48.     Your affiant believes that when **Harvey** texted **Dotson** "I put the stuff and what was in camper in storage," **Harvey** was using coded language to tell **Dotson** that he concealed drugs ("stuff") in **Dotson's** storage unit—**TARGET LOCATION 3**. When **Dotson** texted **Harvey** "ok bet wya" and **Harvey** replied "headed across bridge," **Harvey** was telling **Dotson** that he was going to **TARGET LOCATION 8** via the Harry Nice Bridge.

49.     Additionally, when **Dotson** texted "which way toward me or to go home" and **Harvey** replied "home meet u on this side somewhere when u get on this side," **Harvey** was referring to being in Virginia, as **Dotson** lives in Clinton, Maryland ("towards me") and **Harvey**

20

resides at **TARGET LOCATION 8** ("home"). Notably, when **Dotson** texted "U get the strap" and **Harvey** replied "in storage in the box of trash bags," your affiant believes that **Dotson** was referring to a firearm ("strap"), and **Harvey** had concealed the firearm in **Dotson**'s storage unit (**TARGET LOCATION 3**) in a box of trash bags.

50.     On July 31, 2019 at approximately 10:05 a.m., **Target Telephone 2** placed an outgoing call (Call 2794) to 240-860-3330, a phone utilized by **Gray**. The following is a partial draft transcript of the conversation between **Dotson** and **Gray**.

| | |
|---|---|
| **Dotson:** | I'm a grab me a motherfucking a white boy, I see what people doing now. |
| **Gray:** | Yeah. |
| **Dotson:** | I'm a grab me a white boy and a, and a motherfucker like Fat Bread, see, Fat Bread be a good motherfucking candidate, but the only thing about him, he don't smoke or nothing, he don't get high or nothing. |
| **Gray:** | Yeah, he don't get high. |
| **Dotson:** | He can think for himself a little bit, you feel what I'm saying? |
| **Gray:** | Yeah. But he really can't though. (Laughs) |
| **Dotson:** | Yeah you know what I mean though. |
| **Gray:** | Yeah, I know what you mean. |
| **Dotson:** | I know what I got to do with Fat Bread, I got to be the one to get the money and just give it to him, like that, and tell him look, I'm gonna give you a hundred and fifty dollars for doing this job. |
| **Gray:** | Yeah, Yeah. |
| **Dotson:** | I already know how he is, I'm already on it. |
| **Gray:** | He not about moving nothing himself. |

**Dotson:**    He like a (U/I) anyway so if I can make it a hundred dollars a day, he gonna do whatever I tell him to do.

            . . .

**Dotson:**    One thing about Fat Bread, I don't give a fuck what he say, I know he got at least a stack or two put up, she don't know where that's at.

**Gray:**    Sure, he do, sure he do.

51.     Your affiant believes that when **Dotson** said "I'm a grab me a white boy and a, and a motherfucker like Fat Bread, see, Fat Bread be a good motherfucking candidate, but the only thing about him, he don't smoke or nothing, he don't get high or nothing," **Dotson** was using vague language to tell **Gray** that **Dotson** would like to have a drug runner ("white boy") who has a drug dependency who **Dotson** can recruit to sell drugs on **Dotson**'s behalf.

52.     Further, **Dotson** told **Gray** that **Harvey** ("Fat Bread") is a good candidate, but that **Harvey** does not use drugs ("he don't get high"). When **Gray** tells **Dotson** "he not about moving nothing himself," **Gray** was referring to **Harvey** not being motivated to take initiative in distributing drugs, and only distributing at **Dotson**'s direction. When **Dotson** said "if I can make it a hundred dollars a day, he gonna do whatever I tell him . . . I know he got at least a stack or two put up," **Dotson** was using vague language to describe how he paid **Harvey** for distributing drugs at **Dotson**'s direction, and how **Harvey** has made some money from **Dotson** ("a stack or two put up").

## **CONCLUSION**

53.     Based on the foregoing evidence, there is probable cause to issue the requested warrants.

_____
Special Agent Cameron Taylor
Drug Enforcement Administration


Subscribed and sworn before me this ___14th___ day of August 2019.

/s/

_____
Roderick C. Young
United States Magistrate Judge
United States Magistrate Judge

23

## ATTACHMENT A-1
### Location to be searched

**TARGET LOCATION 8**— located at 10484 Cherry Street, Apartment 110C, King George, Virginia —is described as multi-unit apartment building. The building has brown-colored brick, and the numbers, "10484" are clearly affixed on the right side of the building on a black placard with white numerals. The apartment door to Apartment 110C is situated inside second-story of the building, is white in color, and has the number, "110C," clearly affixed to the center of the door, in white numerals, on a black background.





2

## ATTACHMENT A-2
## Location to be searched

**TARGET VEHICLE 1** is described as a white 2008 Ford Crown Victoria, bearing

Vehicle Identification Number ("VIN"): 2FAFP71V38X178822 and Maryland tag 5CV6135

affixed to the vehicle.

3

**ATTACHMENT B**
**Items to be seized**

a.   Controlled dangerous substances, including heroin, fentanyl, Cocaine, Cocaine base, also known as "crack" Cocaine, marijuana, MDMA, and any other illegal controlled substances, as well as any materials or items used for the preparation of illegal controlled substances.

b.   Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation, ordering, purchasing, and distribution of controlled substances.

c.   Address and/or telephone books, papers, paging devices and their contents, and cell phones and their contents reflecting names, addresses and/or telephone numbers, including computerized or electronic address and/or telephone records.

d.   Books, records, receipts, bank statements and record money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, safety deposit keys, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets in the obtaining, secreting, transfer, concealment and/or expending or money.

e.   United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds.

f.   Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, and other documents identifying associates and co-conspirators.

g.   Indicia of occupancy, residence and/or ownership of the target locations, including but not limited to, utility and telephone bills, canceled envelopes and keys.

h.   Indicia of travel, including but not limited to, passport, visas, airline tickets, boarding passes, and airline receipts.

i.   Safes (combinations or lock-type) and their contents.

j.   Computers, computer hardware, cellular phones, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses.

4

The following definitions apply to the terms as set out in this affidavit and attachment:

1.      Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods, internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices), peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

2.      Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

3.      Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

4.      Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches. Data security software or code may also encrypt, compress, or hide protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

5.      As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware,

software, documentation, passwords, and/or data security devices.

For any computer, computer hard drive, cell phone, or other physical object upon which computer data can be recorded ("the device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

1. Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

2. Evidence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

3. Evidence of the lack of such malicious software.

4. Evidence of the attachment to the device of other storage devices or similar containers for electronic evidence.

5. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device.

6. Evidence of the times the device was used.

7. Passwords, encryption keys, and other access devices that may be necessary to access the device.

8. Documentation and manuals that may be necessary to access the device or to conduct a forensic examination of the device.

9. Contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the

6

items to be seized):

1. Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files).

2. Opening or cursorily reading the first few "pages" of such files in order to determine their precise contents.

3. Scanning storage areas to discover and possible recover recently deleted files.

4. Scanning storage areas for deliberately hidden files.

5. Performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of theft of government property or other criminal activity, the further search of that particular directory, file or storage area, shall cease.

7